DAVID ALLEN HUMPHREY *v.* STATE OF MARYLAND

[No. 1024, September Term, 1977.]

*Decided June 8, 1978.*

The cause was argued before MORTON, MOYLAN and COUCH, JJ.

*Harold Buchman, Assigned Public Defender,* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Following a jury trial held in the Circuit Court for Harford County (Close, J., presiding), appellant was convicted of two counts of first degree murder, two counts of robbery with a deadly weapon and a single count of unlawfully carrying a handgun upon or about his person.[1] He was sentenced to two

---

1. Appellant was also found guilty of use of a handgun in the commission of a felony, to wit, robbery with a dangerous and deadly weapon. No sentence was imposed for this conviction.

consecutive terms of life imprisonment for the murder convictions, two twenty year terms for the robbery convictions, to run concurrently with each other and consecutively to the life imprisonment sentences, and a consecutive three year term for the handgun conviction.

In this appeal appellant raises the following issues:

I. "The Court below erred in admitting, in violation of the Fourth Amendment, fruits of a warrantless house search based on an alleged consent."

II. "The appellant did not waive his right to counsel and his confession was improperly admitted in evidence."

III. "The Court below erred in admitting, in violation of the Fourth Amendment, material found in a warrantless search of a motor vehicle."

IV. "The convictions for robbery with a deadly weapon must be vacated because they merged with the first degree murder convictions."

The record reveals that the bodies of Louis Conti and George Whayland were found on the morning of August 20, 1976, in a cement culvert on Route 13 in Wicomico County. An autopsy report disclosed that the deaths were attributable to gunshot wounds. The victims were employees of the Beer Market located in Salisbury, Maryland, and were working there on the night of August 19, 1976. A witness for the State, Harry Dorsey, testified that he went to the Beer Market about 9:30 p.m. on August 19, 1976, to purchase beer and saw his friends Conti and Whayland leaving the premises with an unidentified man who was carrying a brown paper bag. He went into the store to await the return of Conti and Whayland. When they had not returned in five or ten minutes, he called the police. Victor Rayne, the owner of the store, testified that $687 was taken from the cash register that night and two sixpacks of Schlitz beer had been removed from the cooler as well.

Verlin Lovett testified that he and the appellant, who was a neighbor, had purchased beer at the Beer Market in the early evening of August 19, 1976, after which they returned to Lovett's home. At approximately 9 p.m. appellant left by himself in his pick-up truck, ostensibly to collect some money. He returned around 10 p.m. Shortly thereafter he suggested going to the Wagon Wheel night club to meet some women since he had a lot of money, which he counted out to more than $400. At the Wagon Wheel, appellant, who was an employee of a trash collection business, paid for all of the drinks. Later that evening appellant became engaged in an altercation and fired his pistol in the air about four times. Lovett testified that this pistol resembled the one shown at the trial. Lovett's testimony was essentially verified by his "common-law wife," Marianna, and by John Phillips, who was visiting Lovett at the time.

Several witnesses testified that they saw an individual, whose appearance and dress matched appellant's, lurking around the Beer Market about 9:10 p.m. on the night in question.

As a result of the Wagon Wheel incident and the eyewitness descriptions of the man seen in the vicinity of the Beer Market, attention began to focus on appellant. Sergeant Dykes of the Salisbury Police Department testified that he contacted appellant at his home about 11:30 p.m. on August 21 and took him to police headquarters for questioning. After having been read his *Miranda*[2] rights, appellant asked to talk to his attorney. The attorney was called but was not in and did not return the call. Sgt. Dykes testified that he asked appellant if he wished to have another attorney. Appellant declined, at which point the questioning ceased.

Sergeant Dykes and several other police officers then returned to appellant's home where they were admitted by Ella Humphrey, appellant's wife. Although she was informed that her husband was suspected of the murders, she agreed, according to Sgt. Dykes, to let the police search the house. The police had not obtained a search warrant. The search

2. Miranda v. Arizona, 384 U. S. 436 (1966).

uncovered a .38 Special Charter Arms revolver, a Ruger .375 Magnum revolver and $150 hidden in a hat. Sgt. Samuel Chaffey corroborated Sgt. Dykes' account as to the voluntary nature of Mrs. Humphrey's consent.

Mrs. Humphrey stated at trial that she was aware that she did not have to consent to the search but did so because she did not think the officers would find anything. Although she stated that she got "uptight" in the presence of the police, she testified that no threats or promises were made to her. Moreover, Sgt. Dykes testified that he told Mrs. Humphrey that any evidence found would be used in the prosecution of her husband.

Detective Elton Harrington testified that he was with appellant at the police station when another police officer, Detective Leo Bateman, entered around 12:15 a.m. on August 22 and said: "He doesn't have to tell you anything, Colbourne [Sgt. Dykes] just found the gun." According to Detective Harrington, appellant then stated: "I'll tell you what you want to know." Detective Harrington added that no request for a statement had been made, nor had any threats, promises or coercion been employed. Thereafter, appellant gave a statement, which was recorded on a cassette tape, in which he admitted participating with several other men in the robbery of the Beer Market which resulted in the murders. Detective Bateman stated that he purposely revealed the results of the search in appellant's presence in the hope that this fact would prompt appellant to talk.

Appellant also revealed in the confession that he had used a pick-up truck, owned by his employer, in the execution of the crimes. As a result, the police conducted a warrantless search of the truck which was parked in front of appellant's house at the time of the search. A few strands of hair of the victim Whayland as well as his fingerprints were discovered in the truck according to the expert testimony of Robert Radnotti, a forensic chemist, and Urban Wright, a fingerprint expert. Radnotti also testified that tire impressions taken at the scene where the bodies were found were approximately the same size and tread design as the tires on the pick-up truck. Finally, a firearm's identification examiner stated that

the bullets extracted from the victims had been fired from one of the pistols found in appellant's house.

## I.

Appellant contends that Mrs. Humphrey's consent to the search of their house was not voluntary, but rather was mere "acquiescence to a claim of lawful authority" by the police. "Preliminarily, with respect to the scope of our review . . . in the presence of alleged infringements of constitutionally protected rights, we are required to examine the entire record and to make an independent, reflective constitutional judgment on the facts." *Whitman v. State,* 25 Md. App. 428, 435 (1975).

We note initially that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a [warrantless] search, he has the burden of proving [by a preponderance of the evidence] that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U. S. 543, 548 (1968). *See also Johnson v. State,* 30 Md. App. 280, 294 (1976). The determination whether the consent was voluntary, in the constitutional context, is a factual question to be determined from the totality of all the circumstances. "[A]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte,* 412 U. S. 218, 229 (1973).

Appellant asserts that because of the events of that night, Mrs. Humphrey was "in a state of shock and incapable of denying [the police] . . . the right to search." Appellant points out that "Mrs. Humphrey was 23 years old, with a tenth grade education, with four small children in the house, [that] she had never been arrested or in custody herself or in a situation like the one in which she found herself. She had no telephone to communicate with anyone," and became "uptight" in the presence of the police.

On the other hand, we observe that the police officers employed no chicanery or any form of coercion whatsoever in their dealings with Mrs. Humphrey. In fact, Sgt. Dykes and his colleagues were remarkably candid and forthright about

what their intentions were and what they hoped to accomplish. They informed Mrs. Humphrey that her husband was suspected of murder and that they hoped to find evidence in the house which they could use in the prosecution of the case.

The evidence does not support a finding that Mrs. Humphrey's reason or judgment was, as appellant asserts, overcome by her "vulnerable subjective state." Throughout her conversations with the police, she was in the secure atmosphere of her own home and was not under arrest nor in fear of being arrested. While not controlling, we find it significant that she was totally cognizant of the fact that she could have refused permission to search had she wished. Mrs. Humphrey testified that she allowed the search to take place nonetheless because she did not believe that they would uncover any incriminating evidence. Thus, it appears that Mrs. Humphrey's willingness to allow the warrantless search to take place was basically a tactical decision calculated "to turn suspicion away from [her husband] . . . by appearing to give the authorities innocent and wholehearted cooperation." *United States v. Curiale,* 414 F. 2d 744, 747 (2d Cir. 1969), *cert. denied,* 396 U. S. 959 (1969).

In view of the totality of the surrounding circumstances, therefore, we think it is clear that Mrs. Humphrey's consent to the search was the product of an intelligent, knowing and voluntary decision.

## II.

Appellant next contends that he was denied the rights guaranteed to him under the fifth and sixth amendments to the United States Constitution when the trial judge admitted the confession which he tendered to Detectives Bateman and Harrington in the early morning hours of August 22. It is pellucid that appellant, upon his arrest and the subsequent recitation of his *Miranda* rights, chose to exercise his right to representation before making any statements. It is also clear that the police officers did not interrogate appellant after he invoked his right to remain silent. He claims, however, that he was unconstitutionally induced to confess

as a result of Detective Bateman's representation in his presence that Sgt. Dykes had "just found the gun" in the course of a search of appellant's house.

With regard to appellant's right to be free from compulsory self-incrimination under the fifth amendment, the cases are clear that "the mere fact that the accused was motivated to make an inculpatory statement in reliance upon the officer's deceit does not render the accused's statement inadmissible or involuntary." *Hopkins v. State,* 19 Md. App. 414, 424 (1973). *See also Frazier v. Cupp,* 394 U. S. 731 (1969). We thus have no compunction in concluding that where, as here, no deceit was utilized by the police in their endeavor to elicit a statement from the accused, the confession was voluntary and not in derogation of his fifth amendment rights.

Appellant's contention that he was denied his sixth amendment right to counsel is similarly misplaced. Essentially, he argues that as a result of his asserted desire to speak to his attorney before making a statement, the sixth amendment precludes the admission of the subsequently made inculpatory statement because of the circumstances under which it was elicited.

In support of his position, appellant refers to *Watson v. State,* 282 Md. 73 (1978) and *State v. Blizzard,* 278 Md. 556 (1976), both of which are the progeny of *Massiah v. United States,* 377 U. S. 201 (1964). In *Massiah,* a merchant seaman was arrested and indicted for possession of narcotics. He retained counsel and was released on bail. Thereafter, a co-defendant, acting in concert with the government, permitted a radio transmitter to be installed in his car by which means a narcotics agent could overhear any conversation carried on therein. Massiah made several incriminating statements in the course of a conversation with the co-defendant which the government offered at trial. Justice Stewart, speaking for the Supreme Court, ruled that the indirect and surreptitious interrogation of Massiah, conducted through the co-defendant, violated his right to have counsel present at all interrogations.

While we do not quarrel with appellant's assertion that he was entitled to have counsel present at all interrogations,

direct or indirect, *Miranda v. Arizona, supra; Escobedo v. Illinois,* 378 U. S. 478 (1964), it is also true that *Massiah* does not alter the well established principle that one may waive this right, as long as the waiver is freely, voluntarily and intelligently made, *Watson v. State, supra* at 82; *Jones v. State,* 38 Md. App. 288, 292 (1977).

In the case at bar, appellant's confession was not prompted by any questioning on the part of the police. In fact, Detective Bateman specifically stated that it was not necessary for appellant to say anything. Appellant's decision to confess, therefore, is tantamount to a spontaneous statement and not within the "interrogation" prong of the *Miranda* doctrine. *See, e.g., Graybeal v. State,* 13 Md. App. 557 (1971).

Appellant proffers, however, that since Detective Bateman readily admitted that his revelation to appellant that the gun had been discovered was calculated to elicit a response from him, he was "tricked," in the *Massiah* context, into waiving counsel and inculpating himself. We do not agree. The mere fact that Detective Bateman was cognizant of the psychological ramifications that his revelation might have on appellant does not, in the absence of some sort of deception, constitute trickery. Since Detective Bateman's statement to the other officer in appellant's presence was absolutely true, we do not feel that appellant was "tricked" into waiving his right to counsel at the time he gave his statement. The voluntary nature of the waiver thereby renders the confession admissible.

## III.

We concur, however, with appellant's contention that the trial judge erred in admitting the hair samples and fingerprints found in appellant's truck. Since a search warrant had not been issued prior to the search, we begin our analysis with the presumption that the search was *per se* unreasonable. *Gatling v. State,* 38 Md. App. 255, 258 (1977). We reject the State's position that the search here was authorized by virtue of the automobile exception to the search warrant requirement first enunciated by the Supreme Court in *Carroll v. United States,* 267 U. S. 132 (1925).

Under this exception, a warrantless search of an automobile is not violative of the fourth amendment when probable cause exists that the vehicle contains "fruits, instrumentalities or other evidence of a crime" at the time of the search, *Mobley and King v. State,* 270 Md. 76, 81 (1973), and that exigent circumstances are also present which compel a prompt search of the vehicle. Appellant does not assert that probable cause was lacking at the time of the search. Rather, it is contended that the search was repugnant to the fourth amendment since no exigent circumstances were present which would mandate an immediate warrantless search of the automobile.

At the time of the search, appellant was under arrest and was being held at the police station. The search was conducted during the middle of the night at a time when the truck was parked in a placid environment in front of appellant's house. The State failed to proffer any evidence that either appellant's employer (the owner of the truck), appellant's accomplices in the crime, or his wife in any way evidenced a potential to remove the truck before the police could obtain a search warrant. In this factual posture we are persuaded that the reasoning employed by Justice Stewart in *Coolidge v. New Hampshire,* 403 U. S. 443 (1971) is also appropriate to the case *sub judice.* At pages 461-62, he said:

> "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States* — no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' *Carroll,*

*supra,* at 153, and the 'automobile exception,' despite its label, is simply irrelevant."

*See also Dixon v. State,* 23 Md. App. 19 (1974).

Under circumstances such as these when there is no apparent risk that a delay in the search would raise the possibility of destruction or removal of the evidence, it is incumbent that the police first obtain a search warrant, as mandated by the fourth amendment, before a search of the vehicle can be conducted. The individual rights safeguarded by the requirement that a search warrant be issued by a neutral, detached magistrate prior to search far outweigh the inconvenience incurred by having the police guard the vehicle for a short period of time when, as here, such action could have prevented its removal. *Cf. England and Edwards v. State,* 274 Md. 264 (1975).

The State makes the alternate argument that the search of the truck also qualifies under the "search incident to a lawful arrest" exception to the warrant requirement. We think this position is patently frivolous. In *Chimel v. California,* 395 U. S. 752 (1969), the Supreme Court limited this type of search to the area within the arrestee's "immediate control." 395 U. S. at 763. It cannot conceivably be argued that the truck was within appellant's immediate control since he was in the police station at the time the truck was searched. Under these circumstances, we simply do not find that any of the various criteria supporting the "search incident" exception are applicable to the case at bar.

Even though we conclude that the fingerprint and hair sample evidence were erroneously admitted, a reversal is not required. The record reveals that there was overwhelming evidence before the jury of appellant's guilt over and above the fingerprints and hair samples. Although there is no need for us to recount all of the evidence, we do note that the State proffered for the jury's consideration, *inter alia,* the murder weapon which was discovered hidden in appellant's house and, more importantly, appellant's confession. We conclude that the erroneous admission of the evidence obtained from the unconstitutional search of the truck was "harmless error"

beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638 (1976).

## IV.

In his final contention appellant asserts that the simultaneous convictions for first degree murder and armed robbery violate his rights under the fifth amendment's double jeopardy clause. In *Newton v. State,* 280 Md. 260 (1977), the Court of Appeals made it clear that separate convictions for first degree murder under the felony-murder statute, Maryland Code, art. 27, §§ 408-10, and the underlying felony (in this case armed robbery, which is governed by § 410)[3] violate the double jeopardy clause, since proof of the commission of the underlying felony is an essential element in the crime of felony-murder. In such a situation, the conviction for the underlying felony is merged into the felony-murder conviction and thereby vacated.

On the other hand, merger is not appropriate when the first degree murder conviction is predicated on an unjustified, premeditated killing with malice aforethought as set forth in Maryland Code, art. 27, § 407, since the murder conviction, in such a situation, was entered without reliance on a finding of guilt of a lesser included crime.

In the present case, the jury simply returned verdicts of guilty of murder in the first degree. They did not elucidate whether the convictions were premised on a finding of premeditation (§ 407) or under the felony-murder statute (§ 410).

In *Frye v. State,* 37 Md. App. 476 (1977),[4] Chief Judge Gilbert, after a careful and penetrating analysis of *Newton v. State, supra,* concluded at 479-80, that *"Newton* should read in pertinent part:

> 'If ... the murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under § 407, or if the evidence is

---

3. Section 410 states that "[a]ll murder which shall be committed in the perpetration of ... robbery ... shall be murder in the first degree."

4. The Court of Appeals granted certiorari (No. 133, September Term, 1977); case argued on May 3, 1978; decision pending.

sufficient for a jury [*under proper advisory instructions from the court*] to find those elements, the offenses would not merge. Each offense would then require proof of facts which the other did not, and convictions on both would be proper.' "

Addressing the factual posture presented in *Frye,* Chief Judge Gilbert said, at 478:

"The nub of the problem is that if the jury found the appellant guilty of the 'felony murder' then, under *Newton* and its progeny, the robbery charge and the handgun violation directly attributable to the robbery offense would have merged into the felony murder. From the record, it is impossible for us to determine with any degree of certainty which of the permitted inferences the jury drew."

He went on to say, at 480:

"As we have indicated, in the absence of such jury instructions and in light of the resultant verdicts, we are unable to state which of the permissible inferences the jury drew in arriving at its verdict in the case *sub judice.* We resolve the doubt in favor of the appellant, and we vacate the judgments entered on the robbery with a deadly weapon and the related handgun charge." [5]

The case at bar falls four-square within the factual posture of *Frye.* Here there was an absence of "the proper advisory instructions" delineated in *Frye* and we are unable to perceive which permissible inference the jury drew in arriving at its verdicts. Accordingly, we resolve the dilemma in favor of appellant and vacate the two judgments of convictions for robbery with a deadly weapon.

*Judgments of murder in the first degree and handgun violation, affirmed; judgments of robbery with a deadly weapon, vacated; costs to be paid by appellant.*

---

5. *But see* Jones v. State, 38 Md. App. 288 (1977) (*cert. granted* together with Frye, No. 173, September Term, 1977) and Godwin v. State, 38 Md. App. 716, 736-38 (1978).