## JASPER VINES, JR. *v.* STATE OF MARYLAND

[No. 83, September Term, 1978.]

*Decided December 6, 1978.*

The cause was argued before MOYLAN, LOWE and MELVIN, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Marshall Feldman, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court. MOYLAN, J., concurs and filed a concurring opinion at page 663 *infra.* LOWE, J., dissents and filed a dissenting opinion at page 667 *infra.*

On May 13, 1976, the appellant, Jasper Vines, Jr., was found guilty at a jury trial in the Criminal Court of Baltimore of possession of heroin in sufficient quantity to indicate an intent to distribute. He had been charged with that offense as a subsequent offender, and following the jury verdict on May 13, 1976, elected to have the issue of whether or not he was a subsequent offender tried by the court. The court determined that he was a subsequent offender and on July 22, 1976, he was sentenced to the custody of the Division of Correction for a period of 20 years.

In this appeal, four questions are presented:

"1. Did the trial judge err in denying Appellant's motion to suppress his alleged confession?

2. Is Appellant's conviction and sentence as a second offender under Article 27, § 300 null and void?

3. Did the trial judge err in denying Appellant's motion to suppress evidence?

4. Was the evidence sufficient to sustain Appellant's conviction?"

As we find no reversible error, the judgment below will be affirmed.

I

Appellant was arrested on September 15, 1975, at his home at 420 North Castle Street in Baltimore during the execution

of a search and seizure warrant. He was taken to police headquarters and advised of his *Miranda* rights by Detective Snipes, whereupon appellant stated he did not want to answer any questions and according to police witnesses none were thereafter asked. Appellant was then taken from the interview room to the "roll call" room in the same building. There was a table in the roll call room on top of which were displayed several "tinfoil packets". One of the three police officers in the room then told the appellant that the items displayed had been recovered from 420 North Castle Street. According to police testimony the appellant then "stated that it was his stuff" and "wanted to know what he could do to help himself out". On appeal, appellant contends that the display of narcotics was tantamount to unlawful "interrogation" in violation of the dictates of *Miranda v. Arizona,* 384 U. S. 436 (1966). We disagree.

As stated by the U. S. Supreme Court in *Miranda, supra,* at 478:

> "In dealing with statements obtained *through interrogation,* we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, *but whether he can be interrogated. . . .* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (Emphasis supplied)

Under the circumstances here, we do not interpret the statement made by the police to the appellant and the appellant's viewing of the narcotics as "interrogation" simply because they were followed by an incriminating disclosure from the appellant. *See Brewer v. Williams,* 430 U. S. 387, 419-420 (1977) (Burger, C. J. dissenting); *Howell v. State,* 5

Md. App. 337 (1968); *Hopkins v. State,* 19 Md. App. 414 (1973), cert. denied, 271 Md. 738 (1974); *Cummings v. State,* 27 Md. App. 361 (1975); *Dent v. State,* 33 Md. App. 547 (1976); *Humphrey v. State,* 39 Md. App. 484 (1978). Thus, although the inculpatory statements were made in a custodial setting, we hold that they were not the product of "interrogation" proscribed by the *Miranda* decision.

Appellant's further claim that the inculpatory statements were not voluntary as being the result of "phsychological coercion" is likewise without merit. It is not disputed that shortly before making the inculpatory disclosure, appellant had been fully apprised of his right to remain silent and that anything he said might be used against him in a court of law. It is also undisputed that he understood those rights. Merely because the police entertained the hope (not expressed to appellant) that the display of narcotics would produce an incriminating statement does not mean that in allowing the appellant to view the display they were improperly compelling, coercing, or inducing the appellant to speak. We agree with the trial judge who, in denying the motion to suppress, said: "The defendant I don't think was compelled under the atmosphere to say anything, and he wasn't asked any questions as far as I am concerned in the roll call room". Ironically, according to appellant's version of the events in the roll call room, the police never informed him that the drugs displayed were seized in the raid on his house, but rather in the area of a nearby bar — thus rendering the notion of "phsychological coercion" even more remote.

Our independent review of the record as a whole convinces us that the appellant's constitutional privilege against compulsory self-incrimination was in no way violated.

## II

Appellant contends that his conviction and sentence as a subsequent offender is a nullity because the addendum filed with the indictment pursuant to then Rule 713 b referred to the wrong section number of Article 27 (i.e. section 300 instead of section 293). This contention is likewise devoid of

merit. The addendum properly set forth all the facts necessary to charge appellant as a subsequent offender under the correct section number (293). The parenthetical notation to section 300 at the end of the addendum was non-essential and mere surplusage. As said by the Court in *Sonnier v. United States,* 314 F. 2d 69, 70 (4th Cir. 1963), the appellant "could not have been more clearly informed of the nature of the charge against him if the correct citation had been made". *See,* also, *Kirsner v. State,* 24 Md. App. 579, 583, *cert. denied,* 275 Md. 752 (1975).

## III

The appellant attacks the sufficiency of the probable cause in the application for the search and seizure warrant that resulted in his arrest and the seizure of the heroin he was charged with possessing. Applying the "two pronged test" of *Aguilar v. Texas,* 378 U. S. 108 (1964), and *Spinelli v. United States,* 393 U. S. 410 (1969), we note that appellant argues only that the "veracity prong" of the test has not been met. In this regard, the affidavit in support of the warrant states:

> "[The informant] has proven to be reliable in the past and has supplied your affiant information which has led directly to the arrest of (1) person for a narcotic violation and the recovery of a quantity of controlled dangerous substance. [The informant] has also made another controlled narcotic purchase for your affiant. [The informant] has supplied information to your affiant which your affiant has verified and found to be true and factual. [The informant] states that he or she is familiar with heroin and its effects and has used heroin in the past. [The informant] further stated that he or she is also familiar with the manner in which heroin is packaged for street sales and the prices of heroin."

In addition, the affidavit describes in detail a "controlled buy" from the appellant performed by the informant under the direct supervision of the affiant.

Under the circumstances, we have no difficulty in concluding that there was sufficient probable cause for issuance of the warrant. *Sewell v. State,* 34 Md. App. 691 (1977).

## IV

Finally, appellant challenges the sufficiency of the evidence to warrant his conviction. Our review of the record convinces us that this contention is totally meritless. *Williams and McClelland v. State,* 5 Md. App. 450 (1968).

*Judgment affirmed.*
*Costs to be paid by appellant.*

*Moylan, J., concurring:*

I concur. I join unequivocally both in the result in this case and in all aspects of the majority opinion by Judge Melvin.

By way of concurrence, however, I offer these few additional comments in the desire to come to grips with the sincere, but unsettling, observations made by Judge Lowe in dissent. I share his anguish at what seems, sometimes, to happen to the language as it is used by courts. He chides the Law for not always meaning what it seems to be saying. I find his observations particularly unsettling because they reinforce an increasingly entertained feeling of my own that the language of the Law frequently fails utterly to communicate what is really happening. It would behoove us, I submit, to take a leaf from the book of the Realistic School of Jurisprudence, led by Karl Llewellyn of Columbia and Jerome Frank of the Second Circuit, which revolutionized in the 1930's our thinking about the very process of Law. Their first commandment was to look beneath the surface of the words used by courts at what is really happening within courts and judges. Animated by that realistic approach, I note the following observations.

Judge Lowe reads the facts in this case to fall beneath the coverage of *Miranda v. Arizona.* I agree with Judge Melvin

that the facts in this case are not covered by *Miranda v. Arizona*. Even assuming, however, that Judge Lowe's reading of the facts is correct (which I do not believe), I still could not agree with his legal conclusion. His logic, otherwise impeccable, proceeds, I believe, from a false premise.

The unspoken predicate for Judge Lowe's analysis is that the spirit of *Miranda v. Arizona* is still alive and well on East Capitol Hill. It is my reading of both the case law and of the history of our times that the spirit of *Miranda* has been dead for a decade. Because of judicial procedural conservatism, *Miranda,* as a shriveled skeleton of itself, is not technically dead. It is still capable of controlling a situation squarely on all fours with its facts. As a vital juridical force, however, capable of even minor extension to other sets of facts, it was sapped of all vitality as long ago as the Presidential Election of 1968.

The law, in splendid isolation, simply cannot ignore what every realistic layman knows to be true. Leaving aside all value judgment and simply assessing the judicial-political realities of our times, *Miranda v. Arizona* came at the very crest of the Warren Court's revolution of the constitutional-criminal process. More than any other case, *Miranda* became the public symbol of that revolution. It spawned countless state and federal proposals, both statutory and by way of proposed constitutional amendment, to dismantle much of the reform worked by the Warren Court. As Mr. Dooley observed a century ago, "The Supreme Court reads the election returns." In significant measure, the election of 1968, for better or for worse, was a mandate to cut back on the Warren Court generally and on *Miranda* specifically. In the wake of that mandate, the Supreme Court was significantly restructured qualitatively as well as quantitatively.

Although the fiction of the law pretends otherwise, the Supreme Court is not a monolithic Rock of Ages but a fluid body, changing as its composition and the political complexion of that composition changes. It might well be that the Warren Court would have read the facts now before us as Judge Lowe reads them, but that is beside the point. I have no doubt that

the Burger Court would read the facts before us as Judge Melvin and I read them. The hard reality is that the Burger Court, and not the Warren Court, today represents "the law of the land."

Not once since 1968 has the Supreme Court reversed a conviction on the basis of *Miranda* nor even held *Miranda* to apply. Despite clear language in *Miranda* pointing the other way, *Harris v. New York,* 401 U. S. 222 (1971), held that *Miranda* did not apply to a confession offered in rebuttal for purposes of impeachment. *Michigan v. Tucker,* 417 U. S. 433 (1974), denied *Miranda* even the dignity of being of "constitutional dimension," as it held that a *Miranda* violation was not even enough to trigger analysis under the "fruit of the poisonous tree" doctrine. *Oregon v. Hass,* 420 U. S. 714 (1975), like *Harris v. New York,* refused to apply *Miranda* to a rebuttal-impeachment situation, dealing with a case where a request for counsel under *Miranda* had been flatly ignored by the police. *United States v. Mandujano,* 425 U. S. 564 (1976), refused to apply *Miranda* to interrogation before a grand jury. *Oregon v. Mathiason,* 429 U. S. 492 (1977), refused to apply *Miranda* to a case where a parolee-suspect voluntarily came to the police station and was there interrogated. In *Brewer v. Williams,* 430 U. S. 387 (1977), the Supreme Court, in reversing a conviction for what clearly could have been a *Miranda* violation, pointedly ignored the very existence of *Miranda* and based its decision on other grounds.

The unmistakable message I get from the Supreme Court was expressed by this Court in *Bartram v. State,* 33 Md. App. 115, 149:

"To give 'the broadest possible reading' to *Miranda* in any respect is simply not the current tenor of Supreme Court thinking. The constitutional interpretations of that Court are not immutable as the laws of the Medes and the Persians. It is to blink at reality for the law to pretend not to see what every literate layman knows — that *Miranda v. Arizona* is in definite disfavor with the strong majority of the

present membership of the institution charged with interpreting the law of the land. *Miranda* has not been overruled and is not likely to be overruled. The disfavor is manifested by its being read and applied in a restrictive rather than an expansive manner."

Even Judge Lowe's reading of the facts must concede that the case before us is not absolutely controlled by a literal, four-square application of *Miranda*. There is some room for maneuvering. We may determine, guided by the prevailing spirit of the law of the land, whether to squirm slightly forward or inch slightly backward. To discern that prevailing spirit, it is not enough to read *Miranda* in a vacuum. We must set a weather eye for the larger tide to see whether the direction of movement is forward or backward. The trend is unmistakable. Its message is clear that *Miranda*, even as far as it goes, is in distinct disfavor and that it will not be extended by the Supreme Court by so much as a millimeter. This is the reason I perceive for giving *Miranda* a tightly restrictive reading in this case. If, on the other hand, *Miranda* were riding a flood tide rather than an ebb tide, one might agree with Judge Lowe that a logical extension of its spirit would compel the result he urges. My reading of the history of our constitutional law for the last decade indicates that as of 1978, *Miranda* is a setting sun and not a rising sun. I am not unhappy with this state of affairs but even if I were, objectively I would still have to read the history of the decade in the same way.

I quite agree with Judge Lowe that a cleaner method of accomplishing this constitutional purpose would be frankly and candidly to overrule *Miranda*. That prerogative, however, lies in Washington and not in Annapolis.

Judge Lowe suggests as an alternative avenue for reaching the result he seeks a holding that the right to the assistance of counsel under the Sixth Amendment was violated. The Supreme Court has made it clear that an individual only becomes "the accused" for purposes of the attachment of the right to counsel as of the time of indictment. *Kirby v. Illinois,* 406 U. S. 682 (1972); *Massiah v. United States,* 377 U. S. 201 (1964).

I agree completely with Judge Melvin in his reading of the facts and the application of the law to those facts and, therefore, I vote to affirm. Even if, arguendo, I agreed with Judge Lowe's reading of the facts, I would still vote to affirm because of my strong conviction that *Miranda* is now sapped of all vitality except in those cases squarely covered by it.

*Lowe, J., dissenting*:

I respectfully dissent. When appellant cut short his interrogation in the "interview room" because "he didn't want to answer any questions" he explained that he was "going to get a lawyer" although he did not want one at that moment. Appellant was then taken to the "roll call" room where the incriminating evidence taken from his apartment was spread out on a table. Upon being told that the evidence had been taken from the address where appellant presumably lived, he admitted ownership of the proscribed drugs. Some of the testimony of the officer who testified as to the "spontaneity" of appellant's "blurt" is necessary to set the stage for my concern with the majority opinion:

> "Q. [Defense counsel]: Is it not a fact that the purpose you would bring him into the second room for, specifically the roll call room where the narcotics were laid out on the table, was that you attempted—let's be honest if you can—to get a statement?
>
> MR. GREENBERG: Objection.
>
> THE COURT: Overruled.
>
> MR. GREENBERG: It's on the phraseology, Your Honor.
>
> MR. SNYDER: I will strike that phraseology on that. *Was the purpose for bringing the Defendant into the roll call room an attempt to get an incriminating statement from him?*
>
> THE WITNESS: *That was not the sole purpose.*
> BY MR. SNYDER:
>
> Q. What was one of the purposes?

668

A. *The sole purpose was to obtain his help in getting information relative to who was over top of them.*

THE COURT: How was that going to result from his seeing all of that stuff to give a statement as to who was on top of him?

THE WITNESS: Well, it works in strange ways. Usually that's our policy.

THE COURT: What do you mean by that?

THE WITNESS: *Well, to let the person know what we have laid out and just so we can obtain his information to help us.*

THE COURT: *How do you get that information by showing him?*

THE WITNESS: *We say this is what we have.*

THE COURT: And then what?

THE WITNESS: We get a copy of the return and are there any questions about what was recovered. *It was just an attempt to get him to help us.*

THE COURT: What do you mean by help you?

THE WITNESS: In heroin traffic in the neighborhood of the 437 Club.

THE COURT: By getting him to cooperate and telling the people who are dealing in the narcotic traffic?

THE WITNESS: Yes, if he has any knowledge.

BY MR. SNYDER:

Q. Once again, Detective Snipes, you are saying your purpose is two-fold, one to get a statement that he was involved and two you could get him to turn informant or State's evidence, is that correct?

A. The main object was to get him to turn State's evidence.

Q. Did you get him to admit any involvement before turning State's evidence?

A. I don't think so.

Q. How can a man turn State's evidence if he hasn't told you it's his stuff?

MR. GREENBERG: Objection.

THE COURT: Overruled.

THE WITNESS: I don't think he admitted anything if that's what you are asking.

MR. SNYDER: *If we analyze what was said prior, we have a man who doesn't want a lawyer, not at that time, but eventually; you stop questioning him and you take him to the roll call room and the purpose of that is to get him to become an informant or turn State's Evidence?*

MR. GREENBERG: Objection.

THE COURT: Overruled.

THE WITNESS: *Yes.*

MR. SNYDER: Yet he never told you that it was his stuff to begin with?

THE WITNESS: Right.

MR. SNYDER: We understand you, the purpose of that was mainly to get him to turn State's Evidence?

MR. GREENBERG: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

MR. SNYDER: *Another purpose was to get him to make an incriminating statement?*

MR. GREENBERG: Objection.

THE COURT: Overruled.

THE WITNESS: *I would say that was a thought, but that was not the main purpose.* (Tb.36-39) (Emphasis added)

* * *

THE COURT: The statement to you, this is my stuff, did that statement immediately follow what you said, this is what we recovered from your house?

THE WITNESS: Yes.

THE COURT: It was his immediate response to that?

THE WITNESS: Yes. (Tb.42)

\* \* \*

MR. SNYDER: You are testifying then that it wasn't his expressing that it was his stuff that you then informed him how or he may help, is that correct?

THE WITNESS: Yes.

MR. SNYDER: Let me ask you this, Detective Snipes, let me ask you this, in the interview room the Defendant told you that he did not want to answer any questions and he told you that?

THE WITNESS: Yes.

MR. SNYDER: You testified that one of the purposes for taking him into the roll call room was to show him the narcotics, to show him it was his?

THE WITNESS: Yes.

MR. SNYDER: Why did you do that if you did not intend to ask him questions?

MR. GREENBERG: Objection.

THE COURT: Overruled.

THE WITNESS: *Why did I do that?*

MR. SNYDER: Yes.

THE WITNESS: *To get him to help us.* (Tb.44-45) (Emphasis added)".

It is perfectly ridiculous to permit this admission (which amounts to a confession) to be introduced upon the lame excuse that no actual question was asked. The question was implicit, however punctuated, and in whatever room it was propounded. The Supreme Court in *Miranda v. Arizona,* 384 U. S. 436, 473-474 (1966), stated unequivocally that:

*"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At*

this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Footnote omitted and emphasis added).

In light of *Miranda's* unequivocal directive it should be unnecessary to state the obvious. The procedure that followed in the roll call room, which was admittedly intended to elicit from appellant information relating to other persons in the narcotics world, presupposed appellant's participation therein. Accordingly, it was a denial of appellant's fifth amendment rights, and hardly a subtle one at that. If *Miranda's* clear meaning has so little viability as to permit so embarrassingly apparent a subterfuge as this, *Miranda* should be reversed by the Supreme Court outright, rather than circumvented in this manner. We are wont to point with pride at our judicial platitudes prescribing constitutional protections of individual rights, but we view them with alarm when we are called to apply them in a hard case. Allowing semantic subterfuge to frustrate clearly stated constitutional protections cause the public to look askance at our system, and with good reason.

The continued interrogation by the "show and tell" method was admittedly intended by the police to elicit information; primarily, to find out from appellant the names of his superiors and associates in the drug business, and secondarily, to obtain an incriminating statement. Obviously, if the primary purpose was accomplished, as I have noted, it presupposed a self-incrimination by appellant. This deliberate intent as expressed by the police distinguishes this case from *Humphrey v. State,* 39 Md. App. 484, 490-492 (1978). There Judge Morton was careful to point out that appellant's confession was tantamount to a spontaneous statement because it was " . . . not prompted by any questioning on the

part of the police. In fact, Detective Bateman specifically stated that it was not necessary for appellant to say anything." *Id.* at 492. Notwithstanding this distinction, had I been on the *Humphrey* panel, there, too, I would have dissented. Here I am even more disturbed, because we are condoning a standard procedure of interrogation which is a shamefully obvious method of circumventing *Miranda.*

The admittedly deliberate conduct by the police is also most significant in light of appellant's custodial condition and his express declaration that he was going to get a lawyer. Assuming, however, that we concede that the Supreme Court is moving away from *Miranda,* it should be pointed out that appellant's sixth amendment rights were also directly violated (unless the Court is moving away from these protections too).

Despite the fact that appellant was not formally indicted, he was certainly at a stage in the preliminary proceedings when he obviously needed effective representation of counsel. Upon his arrest, appellant was no longer a mere suspect and the officers weren't simply making inquiries into an unsolved crime. He was an accused, and the interrogation was a form of pretrial preparation. Indeed, the nature and effect of that which the police deliberately elicited from him indicates that this was perhaps the only stage when legal advice would help him.

In *Massiah v. United States,* 377 U. S. 201 (1964), a police investigation continued against Massiah—after his indictment—and an incriminating conversation was surreptitiously obtained by the police. The Court held that Massiah was denied his sixth amendment right to counsel.

"In *Spano v. New York,* 360 U. S. 315, 3 L.Ed.2d 1265, 79 S. Ct. 1202, this Court reversed a state criminal conviction because a confession had been wrongly admitted into evidence against the defendant at his trial. In that case the defendant had already been indicted for first-degree murder at the time he confessed. The Court held that the defendant's conviction could not stand under the

Fourteenth Amendment. While the Court's opinion relied upon the totality of the circumstances under which the confession had been obtained, four concurring Justices pointed out that the Constitution required reversal of the conviction upon the sole and specific ground that the confession had been deliberately elicited by the police after the defendant had been indicted, and therefore at a time when he was clearly entitled to a lawyer's help. It was pointed out that under our system of justice the most elemental concepts of due process of law contemplate that an indictment be followed by a trial, 'in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law.' 360 U. S., at 327 (Stewart, J., concurring). *It was said that a Constitution which guarantees a defendant the aid of counsel at such a trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less, it was said, might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'* 360 U. S., at 326 (Douglas, J., concurring).

Ever since this Court's decision in the *Spano* case, the New York courts have unequivocally followed this constitutional rule. 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' *People v. Waterman,* 9 N. Y. 2d 561, 565, 175 N. E. 2d 445, 448.

This view no more than reflects a constitutional principle established as long ago as *Powell v. Alabama,* 287 U. S. 45, 77 L. Ed. 158, 53 S. Ct. 55, 84 ALR 527, where the Court noted that '. . . during perhaps the most critical period of the proceedings

... that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants ... [are] as much entitled to such aid [of counsel] during that period as at the trial itself.' Id. at 57, 77 L. Ed. 164. And since the *Spano* decision the same basic constitutional principle has been broady reaffirmed by this Court. *Hamilton v. Alabama*, 368, U. S. 52, 7 L.Ed.2d 114, 82 S. Ct. 157; *White v. Maryland*, 373 U. S. 59, 10 L.Ed.2d 193, 83 S. Ct. 1050. See *Gideon v. Wainwright*, 372 U. S. 335, 9 L.Ed.2d 799, 83 S. Ct. 792.

Here we deal not with a state court conviction, but with a federal case, where the specific guarantee of the Sixth Amendment directly applies. *Johnson v. Zerbst*, 304 U. S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 ALR 357. *We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.* It is true that in the *Spano* case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, *'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.* In this case, Massiah was more seriously imposed upon ... because he did not even know that he was under interrogation by a government agent.' 307 F. 2d at 72-73." (footnotes omitted and emphasis added). 377 U. S. at 204-206.

I find no distinction in the underlying reasoning here that appellant was not yet indicted. He was obviously under arrest (when his speedy trial rights commence), in custody, and was

entitled to counsel at this crucial stage of his proceeding. *Massiah v. United States,* 377 U. S. at 204-205. A custodial interrogation, unlike a simple lineup for identification purposes (See *Kirby v. Illinois,* 406 U. S. 682 (1972)), is a stage of the proceedings wherein counsel's assistance is extremely important, else why require a recitation of rights to include that of counsel. ("You have a right to counsel—but not yet."). To paraphrase Mr. Justice Douglas in *Spano, supra,* (as repeated by the Court in *Massiah, supra*) a constitution which guarantees counsel to a defendant under interrogation, after indictment, could hardly justify denying counsel to an arrested accused not yet indicted, saying on the one hand such interrogation *is* a crucial stage of the proceeding and on the other that it is *not.* In either case:

> "Anything less . . . might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.' " *Massiah v. United States,* 377 U. S. at 204.

It is implicit in the warnings prescribed by *Miranda* that before appellant can waive his fifth amendment self-incrimination right he must be informed of—and waive—a right to counsel at any further interrogation. Obviously then, the sixth amendment right to counsel is inseparably interwoven by *Miranda* into the fifth amendment right against self-incrimination. If the latter is violated, the former is necessarily so as well. It is most apparent in this case where appellant articulately exercised both rights. For the police to bring in deliberately through the back door that which they could not take through the front, denies appellant his rights under both the fifth and the sixth amendments. I would reverse and remand for retrial without the use of the damning admission of ownership of the hard evidence.