[Crim. No. 9462.    Second Dist., Div. One.    June 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM HENRY WEBB, JR., et al., Defendants and Appellants.

Robert W. Stanley, under appointment by the District Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendants Webb and Radley and codefendant Bond were charged with receiving stolen property (Pen. Code, § 496); Bond was also charged with burglary and kidnaping. In addition, four prior felony convictions were alleged against Webb and one against Radley; defendants admitted the priors. A jury found defendants guilty as charged. Webb appeals from the judgment, sentence and order denying motion for new trial; Radley appeals from the judgment.

On December 23, 1962, around 2:15 a.m., J. W. Robinson was robbed of approximately 300 furs of a value of about $230,000. The night watchman was threatened with a gun, taken back to a room where the furs were kept, and told to lie on the floor while the bundles of furs were taken and loaded into a station wagon.

Late in December 1962, a Mr. Baker was employed as an undercover officer by the Los Angeles Police Department; he was registered at the Biltmore Hotel under the name of Kaufman. Sergeants Donovan and Walters occupied the suite with him. Sometime between 11:30 and 11:45 p.m. on December 27, Baker received a telephone call from Bond. Following the conversation the officers waited in the hotel bar while Baker met two men in a Cadillac convertible. One of these men was Radley, the other Bond. Bond leaned over and whispered, "Mr. Kaufman?"; Baker responded by walking toward the car. Radley made a gesture of invitation, but Baker told him that they had to do some talking, so they should park the car, go in and have a drink. The three went to the hotel bar; Baker said he had a friend with him, referring to Sergeant Walters. He called Walters over and Baker said to Bond, "Let's talk furs"; Bond said okay, and that he could take him (Baker) to them right then. When Baker asked how many pieces he had, Bond said that he had already told him that on the telephone; Baker then said that from what Bond had told him, they had some fair merchandise which he could use. Baker asked what they were asking for the furs; Bond said he wanted $40,000. Baker offered $15,000. Radley said the furs were well worth the price Bond was asking. The conversation

continued and Baker said that they mentioned something about $100 apiece and asked of they would take $26,000 for the furs; Baker told Bond he would have to see them, whereupon Bond said he would take him to the furs. The four of them started out to the sidewalk, Sergeant Walters and Baker got into a cab and arranged to follow Bond and Radley. They followed the Cadillac to the corner of 113th and Avalon. Baker told the driver to wait and went to 642 113th Street. There were no lights on in the house but Bond knocked on the door three times, then two times, and then one time; Bond said, "This is ''Effie,' or 'Essie.' '' The door opened and the four men entered a dark room, after which the lights were turned on. At this time Baker saw Webb. Walters, Baker, Bond and Radley entered the bedroom and saw a quantity of furs on the two beds. Baker said to Bond, "Let me see the longs"; Bond took out a bundle and opened it up and Baker examined the contents which contained several fur coats; some had J. W. Robinson labels. Then Bond showed him the stoles and later, the capes. Some of the labels were J. W. Robinson labels. Baker told Bond that he had some fair merchandise, he could use it and would give him $30,000 for the lot. Bond said they would take it.

At this time Baker suggested that Walters and he go back to the hotel where they would wait for a call from Bond telling them when and where he could deliver the furs and that he would pay the $30,000 at that time, but Radley said, "No, one of you fellows stay here with us, and the other one can go." Walters mentioned that they had a cab outside and suggested that Baker go with one of them and pay off the driver. Bond said he had a truck and they could all help load the truck, and would take them anywhere they directed; Walters said that was fine, they would pay off the cab and let Baker come back and help load the furs. Radley opened the bedroom door and Webb came in. Someone said to Webb that he was to go along with this man (Baker) and pay off the cab; Webb replied, "You want me to go with Mr. Kaufman?" and was told, "Yes." (From the time they entered the house until this mention of Mr. "Kaufman," no one had discussed Baker's alias in front of Webb.) Webb and Baker left the house to pay off the cab driver; Baker told Webb that he would like to get some cigars since it would take some time for them to count and load the furs, and wanted to go across the street to get them. They walked to and entered the store; Baker, leaving Webb, walked outside and waved his hand to advise police

units in the area of his position, but no one responded to the signal. They then started to the house on 113th Street; when they got into the parking lot, Baker grabbed Webb and placed him under arrest. Baker walked about 40 feet on Avalon and pushed Webb into a phone booth; he held him with one hand and made a search of his person. Later Baker saw a police car, shouted and received assistance. At that same time other police cars arrived and Sergeant Donovan took Webb into custody.

Approximately 10 or 15 minutes later, Radley mentioned that Webb and Baker had been gone a long time and they should see what had happened to them; Walters and Radley then left the premises and Walters observed five police vehicles traveling east on 113th Street. He asked, ''What is going on here''; Radley said he did not know, then said, ''Come on. Let's get out of here,'' and ran south between two houses. Walters stopped one of the police vehicles.

Officer Bishondon was seated in a police vehicle in back of the apartment house and saw Radley running through the yard at the address of 632 East 113th Street. Bishondon told Radley to halt; he came to a stop at which time the officer arrested him and placed him in the police vehicle. Bishondon asked Radley what he was doing running through the yard; Radley said that he had been to a show and was walking down 113th Street. He denied having been in any house on 113th Street that night.

Officer Bishondon had a conversation with Webb at the police station around 5 or 6 a.m. in the morning of December 28, 1962. He told Webb that he wanted him to tell them about the fur burglary at Robinson's and the part he played in it. Webb said he didn't have anything to do with the burglary; that all he was called in for was to help sell the furs. Bishondon said that might be true, but that he had to tell them what his part in ''this thing'' was. Webb then said that he thought that after talking to the other two fellows the police knew what his part in the ''thing'' was; he said that all he had done was to make one telephone call. Bishondon said that he had arrested him sitting on a pile of furs worth $200,000 and that he was guilty of receiving stolen property, if nothing else, and that he would have to say more than he had said. Webb said that he couldn't tell any more and that if he did ''those two fellows are big time, and they'd kill me''; also, ''I am not going to tell you any more until I talk to my attorney. I think I have told you too much already.'' When asked who his attorney was, Webb said he was Wesley Russell and that

Russell had told him to say nothing to anyone about any involvement in this matter.

Officer Bishondon opened the bundles found on the premises; each contained approximately 15 fur pieces, the total number being 278; except for 10, they all bore the Robinson label and the price of the garment.

Webb testified that he went to the 113th Street address to collect a horse racing bet; he waited three or four hours for the man to come and pay him off; meanwhile, Bond and three men came to the house; later he went outside with Baker to get something to eat and was arrested by him on their way back to the house; he never saw any furs in the house and knew nothing about them; he told Officer Bishondon he was going to be represented by an attorney named Russell and that Russell had instructed him not to say anything about this; and before he talked to Officer Bishondon he called Russell on the telephone and Russell told him to remain silent.

Radley also testified to facts that placed him in the presence of Bond at the house under innocent circumstances.

It appears from appellants' opening brief that no contention is made on behalf of Radley. Webb claims that his statements made to Officer Bishondon without his first being cautioned by him that he had a right to counsel and need not make a statement, were inadmissible in evidence and that *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], requires a reversal.

Webb had been found in a house in which were $200,000 worth of stolen furs and where two other men, whom he obviously knew, had attempted to dispose of them to Baker. Webb's presence there was suspicious, although his reason for being in the house could have been consistent with innocence. When Officer Bishondon told Webb he wanted him to tell about the burglary, he was giving Webb an opportunity to explain what, if any, connection he had with the furs. This was proper and under the circumstances here does not constitute "a process of interrogations that lends itself to eliciting incriminating statements" as contemplated in *People* v. *Dorado,* 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361]. (*United States* v. *Konigsberg* (3rd Cir. 1964) 336 F.2d 844, 853; *People* v. *Cotter,* 63 Cal.2d 386, 393, 398 [46 Cal. Rptr. 622, 405 P.2d 862]; *People* v. *Ford,* 234 Cal.App.2d 480, 491-494 [44 Cal.Rptr. 556]; *People* v. *Fork,* 233 Cal.App.2d 725, 735-736 [43 Cal.Rptr. 804]; *People* v. *Cully,* 236 Cal. App.2d 769, 774-779 [46 Cal.Rptr. 644].) Also as to

Webb, even though he was under arrest, the burglary was still an unsolved crime and Officer Bishondon's inquiry was a part of his investigation into the theft of the furs from Robinson's; his questions of Webb were legitimate steps in this investigation. (*People* v. *Washington*, 237 Cal.App.2d 59, 64-65 [46 Cal.Rptr. 545]; *People* v. *Ford*, 234 Cal.App.2d 480, 491-494 [44 Cal.Rptr. 556]; *People* v. *Davis*, 235 Cal.App.2d 214, 227 [45 Cal.Rptr. 297].) Webb, however, denied any complicity in the burglary and volunteered the fact that he had been called in to help sell the furs. When asked by Bishondon his part in it, Webb said he thought that the officers knew his part in it from having talked to the other two defendants, and that all he had done was to make one telephone call. He also said that he couldn't tell any more and that if he did "those two fellows are big time, and they'd kill me."

If Webb's statements were inadmissible under the exclusionary rule set forth in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], at most they constitute admissions. Any error committed by the court in receiving them in evidence does not appear to have been either prejudicial to Webb or to have resulted in a miscarriage of justice. Webb's statements added little to the People's case. The evidence shows that Baker found Webb with Bond and Radley in the possession of the furs at the 113th Street address; that Webb was more than an onlooker or bystander in that he took instructions from Bond and Radley and was ordered by them to accompany Baker to pay the cab driver. Webb knew the alias (Mr. Kaufman) under which Baker was known to Bond and Radley, even though the name had not been mentioned in Baker's presence; this indicates that he must have known from prior discussion with Bond and Radley who Baker was and why he was in the house. When Baker told Webb, after paying off the taxicab, that it would take a long time for them to count the furs and he needed some more cigars, Webb's acquiescence in going to the store is indicative of his knowledge that that is exactly what they would do upon their return to the 113th Street address. In the light of the entire record, we do not think that it is reasonably probable that a different result would have been reached by the jury had Webb's statements not been received in evidence. (*People* v. *Watson*, 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Hillery*, 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)

A third condition set forth in *People* v. *Dorado*, 62 Cal. 2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361], is likewise

lacking in the record before us. It is an established fact, admitted by Webb in his testimony, that prior to the time he talked to Officer Bishondon he telephoned his lawyer, Mr. Russell, who told him not to say anything about the matter. Thus, when Webb made the statements to Officer Bishondon, the admissibility of which he now challenges, he well knew that he had the right to counsel, having already called his lawyer, and knew that he had the right to remain silent, his counsel having so advised him. It was under these circumstances that Webb answered the officer's questions and volunteered the information; and then, Webb exercised his right to remain silent by declining to further discuss the matter with the officer. Webb told Bishondon his lawyer's name and that he had told him (Webb) to say nothing to anyone about any involvement in this matter; and that he was not going to tell him (Bishondon) any more. The fact that Officer Bishondon did not inform Webb of his rights, is not determinative of whether the rights were knowingly waived. (*People* v. *Mathis,* 63 Cal.2d 416, 432 [46 Cal.Rptr. 785, 406 P.2d 65].) In *People* v. *Kelley* \*(Cal.App.) 49 Cal.Rptr. 751, the court stated: "It is not necessary to determine the question whether defendant knew of his right to counsel by resort to inferences, . . . . Defendant testified that he knew at the time that he had a right to counsel. While in the same answer he testified that when he asked Kerr he was refused, the court was free to believe a part of the answer and disbelieve the rest of it. (7 Wigmore (3d ed.) § 2100, p. 496.) It is clear that defendant knew of his right to counsel. The fact that Kerr did not inform him of such right is not determinative as to whether the right was knowingly waived. (*People* v. *Mathis,* 63 Cal.2d 416, 432 [46 Cal.Rptr. 785, 406 P.2d 65].) The purpose of requiring that a defendant be advised of his right to counsel is not to impose upon the police the performance of a formulary gesture, but to protect the constitutional rights of defendant. The knowledge of those rights obtained from other sources so as to make it possible to protect them will remedy the failure of the police to give the admonition."

The judgments are affirmed. Appeal from order denying motion for new trial is dismissed. Affirmance of the judgment carries with it affirmance of sentence.

Wood, P. J., and Fourt, J., concurred.

---

\*A hearing was granted by the Supreme Court on April 26, 1966.