## JASPER VINES, JR. *v.* STATE OF MARYLAND

[No. 137, September Term, 1978.]

*Decided June 27, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The question on this appeal is whether the Criminal Court of Baltimore erred in denying the motion of Jasper Vines, Jr. to suppress certain statements made by him while in the custody of the police. Vines was convicted by a jury of possession of heroin "in sufficient quantity to reasonably indicate under all the circumstances an intent to manufacture and distribute" the drug. He was sentenced to the jurisdiction of the Department of Correction for a period of twenty years.[1]

The question was one of those placed before the Court of Special Appeals on direct appeal.[2] That court held that the trial court properly denied the motion to suppress, and finding no reversible error with respect to the other contentions made by Vines, affirmed the judgment. *Vines v. State,* 40 Md. App. 658, 394 A. 2d 809 (1978) (Moylan, J. concurring; Lowe, J. dissenting). The question was presented to us by Vines' petition for a writ of certiorari and the State's cross-petition conditioned upon our grant of Vines' petition, both of which we granted. We affirm the judgment of the Court of Special Appeals.

---

1. The State warned Vines in an addendum to the indictment returned against him that it intended to prosecute him as a subsequent offender. After the jury found him guilty of the current offense, the court found that he was a subsequent offender as specified in the addendum and imposed sentence accordingly.

2. The appeal was timely noted but subsequently dismissed for failure to perfect it by transmission of the record as required by Md. Rule 1025. A belated appeal was later granted under post conviction procedures.

I

The circumstances surrounding the making of the challenged statements were brought out at the hearing on the motion to suppress held out of the presence of the jury. Certain of the circumstances were not disputed. Vines was arrested in his residence during the execution of a search and seizure warrant. He was taken to police headquarters. In the interview room he was informed of his rights pursuant to the dictates of *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602 (1966). He refused to sign the form waiving those rights and invoked the right to remain silent, asserting that "he didn't want to answer any questions." No further questions material to the issue before us were thereafter asked him by the police. He remained in the interview room for about half an hour while Detective William Snipes of the Baltimore City Police Department completed the administrative procedures for booking Vines, including completion of a narcotic addict form. Vines was then taken to the roll call room. Displayed on a table in that room was some of the contraband recovered in the raid.[3] This contraband was included in the inventory of seized property noted on the back of the warrant. On the table were thirteen tinfoil packets of various sizes, some opened and some closed, each of which contained white powder with brown specks. Vines was given a copy of the warrant containing the inventory.

Other evidence relating to the circumstances regarding the making of the statements was conflicting. It is plain, however, that the trial court, as was its right, believed the

---

3. Evidence adduced by the State at the trial on the merits showed that the raid on Vines' residence under the authority of the search warrant was made at 6:15 a.m. on 17 September 1975. When the police entered the house, about nine people were present. Eight of them, wearing night clothes, ran around screaming. Vines was the only person in street clothes. He was "dressed in black with a white hat." He ran toward the rear of the house and was shortly thereafter apprehended coming from the bathroom. On the floor at his feet was a large tinfoil packet containing two smaller tinfoil packets. They contained, as shown by an analysis later made, 6.9 percent heroin. The ordinary percentage of heroin sold on the street is 3 percent. Shortly after the police entered the premises, an officer stationed outside in the rear of the house saw a man dressed in dark clothes and a white hat throw a brown paper bag out of a window on the second floor. The officer recovered the bag. It contained 250 small packets and two large packets of heroin.

version offered by the police. According to them, when Vines invoked his right to remain silent he said that he was "going to get a lawyer, but didn't want one at that particular time." [4] When Vines was taken to the roll call room and given a copy of the warrant containing the inventory of the property seized, he was told that this is what was recovered from his house during the raid. Thereupon he looked at the display on the table for a couple of seconds, sat down on a chair and "made an outburst," stating that "it was his stuff" and asking "what he could do to help himself out." [5] These two statements were the subject of the motion to suppress.

The police indicated that the immediate reason for taking Vines to the roll call room was "to show him what was taken out of his premises and give him the papers," that is the warrant with the inventory of the articles seized. The main purpose, however, was to get him to turn State's evidence, "to obtain his help in getting information relative to who was over top of him." When Snipes was asked whether another purpose was to have Vines make an incriminating statement, he responded: "I would say it was a thought, but that was not the main purpose."

II

At the heart of the question whether the trial court erred in denying the motion to suppress the statements is the display of the physical evidence. The viewing by Vines of the evidence in the roll call room leads to the question whether the confrontation (1) constituted an "interrogation" within the meaning of *Miranda*, or (2) rendered the statements involuntary in the traditional sense.

In denying the motion to suppress, the trial judge found that there had not been an "interrogation" in the roll call

---

4. Vines testified that he told the police to get his lawyer.

5. Vines maintained in his testimony that he made no statement in the roll call room and specifically denied telling anyone that the packets on the table were his. He also insisted that the police told him: "We didn't get this from your house, but it was found in the area of [the] 437 Club which is a bar."

room and that the statements made by Vines had been voluntarily made. He did not think that Vines

> was compelled under the atmosphere here to say anything, and he wasn't asked any questions as far as I am concerned in the roll call room. It may be true that [Vines] didn't want to talk, he didn't want to answer any questions other than the addict form [completed by Snipes], and if he didn't want to talk he didn't have to say anything. I think he chose voluntarily to say something, maybe on the spur of the moment or maybe he regretted it later, or maybe felt later I should have kept my big mouth shut, but he said it. I also find that the statement which [Vines] may have made subsequent thereto, what can I do for myself, is also admissible. I don't think that is a product of the interrogation or statement.

The majority opinion of the Court of Special Appeals was in complete accord with the views of the trial judge. It held that "although the inculpatory statements were made in a custodial setting, ... they were not the product of 'interrogation' proscribed by the *Miranda* decision," and on its "independent review of the record as a whole," it was convinced that Vines' constitutional privilege against compulsory self-incrimination was in no way violated." *Vines v. State,* 40 Md. App. at 661.

(1)

*Miranda* held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. [384 U. S. at 444.]

Thus, in order to be subject to the *Miranda* warnings, statements must flow from a "custodial interrogation" within the meaning of *Miranda. See State v. Kidd,* 281 Md. 32, 36-37,

375 A. 2d 1105, *cert. denied,* 434 U. S. 1002 (1977). "Custodial interrogation," was said by *Miranda* to "mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. at 444. "Because the custody issue has arisen more frequently and has generally been regarded as a more difficult one, a good deal more attention has been paid to what constitutes *custodial* interrogation than to what constitutes custodial *interrogation.*" Kamisar, Brewer v. Williams, Massiah, *and* Miranda: *What Is "Interrogation"? When Does It Matter?,* 67 Geo. L.J. 1, 14 n. 85 (1978) (hereinafter "Kamisar"). Here, however, the *custodial* aspect of "custodial interrogation" presents no problem. It is patent that Vines was in custody at the time he made the statements. The point to be resolved is whether, in the circumstances, the viewing of the evidence by Vines was tantamount to an "interrogation" by the police. *Miranda* does not specifically define "interrogation." We agree, however, with the refusal of the Court of Special Appeals to interpret, under the circumstances here, "the statement made by the police to [Vines] and [Vines'] viewing of the narcotics as 'interrogation' simply because they were followed by an incriminating disclosure from [Vines]." *Vines v. State,* 40 Md. App. at 660. Throughout the opinion of the Court in *Miranda,* "interrogation" is equated with "questioning." For example, the meaning of "custodial interrogation" as we have indicated, is in terms of "questioning" initiated by law enforcement officers. 384 U. S. at 444. The warnings must be given prior to any "questioning." *Id.* If the suspect indicates that he wishes to consult with an attorney before speaking there can be no "questioning." *Id.* at 444-445. The privilege against self-incrimination is jeopardized when an individual is taken into custody and is subjected to "questioning." *Id.* at 478. The view that questioning is an integral part of a *Miranda* "interrogation" is supported by subsequent opinions of the Supreme Court. The *Miranda* principle was held to be "applicable to *questioning* which takes place in a prison setting during a suspect's term of imprisonment on a separate offense, *Mathis v. United States,* 391 U. S. 1, 88 S. Ct. 1503 (1968) and to *questioning* taking place in a suspect's home,

after he has been arrested and is no longer free to go where he pleases. *Orozco v. Texas,* 394 U. S. 324, 89 S. Ct. 1095 (1969)." *Oregon v. Mathiason,* 429 U. S. 492, 494-495, 97 S. Ct. 711 (1977) (emphasis added). C. McCormick, Evidence 329 (Cleary 2d ed. 1972) states flatly: "A statement obtained without giving the *Miranda* warnings and according the defendant the prescribed rights is inadmissible only if it is the result of 'questioning' or 'interrogation' . . . [T]he courts have had little difficulty characterizing police activity as 'interrogation' when a statement is responsive to police inquiries which on their face call for an answer."

It may be that certain police conduct, though not verbal, may nevertheless be tantamount to interrogation for purposes of requiring *Miranda* warnings. This is suggested in 3 J. Wigmore, Evidence § 826 a at 383, n. 23 (Chadbourn Rev. ed. 1970). *See* McCormick at 329-330; Rothblatt and Pitler, *Police Interrogation: Warnings and Waivers — Where Do We Go From Here?* 42 Notre Dame Law. 479, 486, n. 42 (1967); Graham, *What Is "Custodial Interrogation?": California's Anticipatory Application of* Miranda v. Arizona, 14 U.C.L.A.L.Rev. 59, 107-111 (1967). There seems to be general agreement, however, that *Miranda* does not apply to "administrative questioning," the routine questions asked of all arrestees who are "booked" or otherwise processed. Kamisar at 7, n. 41 and at 14, n. 85. *See* McCormick at 330; Smith, *The Threshold Question in Applying* Miranda: *What Constitutes Custodial Interrogation?* 25 S.C.L.Rev. 699, 704-705 (1974); C. Whitebread, Constitutional Criminal Procedure 178-179 (1978); Graham at 104-106. The short of it is that whether police conduct is tantamount to "interrogation" in the contemplation of *Miranda* depends upon the particular facts and circumstances of each case. Other than with respect to "administrative questioning," the cases throughout the country have presented a wide variety of fact patterns and judicial attitudes both as to the principle involved and its application. They establish no clear pattern we are persuaded to follow.[6]

---

6. For cases determining that there was an "interrogation" within the meaning of *Miranda, see for example,* Combs v. Wingo, 465 F. 2d 96 (6th Cir.

In the case before us, when Vines invoked his right to remain silent, all questioning proscribed by *Miranda* ceased. In the roll call room, shortly thereafter, Vines was given a copy of the search warrant containing the inventory of the property taken. This was in compliance with Maryland Rule 707, now Rule 780. Rule 707 a provided that an officer taking property under a search warrant shall make a written inventory of the property taken in the presence of the person from whom the property is taken if such person is present at the time the warrant was executed. Section b provided that the officer

> shall leave a copy of the inventory and a copy of the warrant with the person from whom the property

---

1972) (reading ballistics report to defendant); Jones v. State, 346 So.2d 639 (Fla. App. 1977) (oral review of evidence to defendant); People v. Sanders, 55 Ill. App. 3d 178, 370 N.E.2d 1213 (1977) (defendant told that co-defendant has made statement, case is very strong; "discussion" of possible penalties); State v. Godfrey, 131 N.J.Super. 168, 329 A. 2d 75 (1974) (statement to defendant: "You're a liar. You were there. You did it. You did it."); State v. Rodriguez, 37 Or. App. 355, 587 P. 2d 487 (1978) (oral review of evidence and discussion of possible evidence); Commonwealth v. Mercier, 451 Pa. 211, 302 A. 2d 337 (1973) (reading statement of third party which implicated defendant); Commonwealth v. Simala, 434 Pa. 219, 252 A. 2d 575 (1969) (defendant told: "You look kind of down in the dumps . . . if you want to talk, talk."); State v. Innis, R.I., 391 A. 2d 1158 (1978) (conversation between police officers re: danger to children from hidden shotgun); State v. Boggs, 16 Wash. App. 682, 559 P. 2d 11 (1977) (questions in the course of "casual conversation" ).

For cases determining that there was not an "interrogation" within the meaning of *Miranda, see, for example,* United States v. Pheaster, 544 F. 2d 353 (9th Cir. 1976), *cert. denied as to co-defendant,* 429 U. S. 1099 (1977) (question — where is kidnap victim being kept? plus review of evidence); United States v. Davis, 527 F. 2d 1110 (9th Cir. 1975), *cert. denied,* 425 U. S. 953 (1976) (defendant shown photograph of himself in bank in the course of robbery); People v. Webb, 243 Cal. App. 2d 179, 52 Cal. Rptr. 85 (1966) (question inviting further explanation of innocent reason for being in house with $200,000 worth of stolen furs); State v. Pahio, 58 Haw. 323, 568 P. 2d 1200 (1977) (police statement: "I got your . . . T-shirt . . . and . . . a pair of brown slippers . . . to be kept as evidence."); State v. Burnett, 429 S.W.2d 239 (Mo. 1968) (confrontation with money); Commonwealth v. Franklin, 438 Pa. 411, 265 A. 2d 361 (1970) (defendant told witnesses had identified him, but they'd like to hear his side of the story); Owens v. Commonwealth, 218 Va. 69, 235 S.E.2d 331 (1977) (officer told defendant he knew he had committed the crime, and "it takes a man to tell the truth.").

The split in both state and federal courts on whether confronting a suspect with physical evidence constitutes interrogation within the meaning of *Miranda* is noted in Nat'l Dist. Attorneys Ass'n, Confessions and Interrogations After *Miranda* 34-35 (J. Zagel 5th rev. ed. 1975).

was taken, if such person is present at the time the search warrant is executed. . . .

When the officer gave Vines the copy of the warrant containing the inventory, he merely made the true statement that this was what was recovered from Vines' house during the raid. We find it plain in the circumstances that the giving of the inventory to Vines in compliance with our rules of procedure, coupled with the simple factual statement by the police, was not tantamount to an "interrogation" within the meaning of *Miranda.* The display of some of the property taken does not compel a contrary result on the facts of this case. In oral argument before us, defense counsel agreed that making known to Vines what property had been taken, even had the police read the inventory to him, would not have been an "interrogation." We fail to see how, in the circumstances, a confrontation with some of the physical evidence listed in the inventory changed the conduct of the police to an "interrogation." In other words, there was no "interrogation" here to which the *Miranda* code was applicable.[7]

Vines relies on *Brewer v. Williams,* 430 U. S. 387, 97 S. Ct. 1232 (1977). That case turned on the constitutional right to assistance of counsel. *Id.* at 405-406. But even if it be deemed that it was implicit in the holding that the conduct of the police officer in giving what has been called the "Christian burial speech" to the suspect was tantamount to an interrogation, it is readily apparent that *Williams* is so factually different

---

7. For opinions of the Court of Special Appeals holding that there was no "interrogation" within the meaning of *Miranda, see, for example,* Humphrey v. State, 39 Md. App. 484, 386 A. 2d 1238, *cert. denied,* 283 Md. 733 (1978) (detective's statement that police had "just found the gun"); Dent v. State, 33 Md. App. 547, 365 A. 2d 57 (1976) (after arrest defendant complained of leg injury; detective examined the leg and asked how it had been hurt); Fellows v. State, 13 Md. App. 206, 203 A. 2d 1 (1971), *cert. denied,* 264 Md. 747 (1972) (review of evidence including statement of third party incriminating defendant); Howell v. State, 5 Md. App. 337, 247 A. 2d 291 (1968), *cert. denied,* 253 Md. 734, *cert. denied,* 396 U. S. 907 (1969) (told of third party's statement incriminating defendant); Gaudio and Bucci v. State, 1 Md. App. 455, 230 A. 2d 700 (1967) (question asked on street shortly after arrest, not "custodial interrogation").

*Compare,* Law v. State, 21 Md. App. 13, 318 A. 2d 859, *cert. denied,* 272 Md. 749 (1974) (continued questioning by detectives after several statements of desire not to talk further); Nasiriddin v. State, 16 Md. App. 479, 298 A. 2d 490, *cert. denied,* 268 Md. 751, *cert. denied,* 414 U. S. 1028 (1973) (not volunteered statement in circumstances).

from the case before us as to provide no support for Vines' position.

## (2)

A statement is voluntary in the traditional sense when it is "obtained without force applied, coercion used, hope held out or promise made on the part of the authorities. . . . In other words, a confession or admission is not 'voluntary' if it is the product of physical or psychological coercion." *Kidd,* 281 Md. at 35-36.[8] *Miranda* expressly affirmed that " '[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment. . . .' " *Kidd,* 281 Md. at 36, quoting *Miranda,* 384 U. S. at 478.[9]

The meat of Vines' contention that the statements were coerced is set out in one short paragraph in his brief. He

> submits that the "show and tell" confrontation in the case at bar was coercive. The confrontation was deliberately staged to generate stress, confusion and

8. We pointed out in State v. Kidd, 281 Md. 32, 375 A. 2d 1105, *cert. denied,* 434 U. S. 1002 (1977), that voluntariness in the traditional sense is bottomed upon constitutional grounds — the privilege against self-incrimination afforded by the Fifth Amendment to the Constitution of the United States flowing to the states through the Fourteenth Amendment. The imposition upon this State of the federal constitutional privilege effected no change in the voluntariness requirement firmly established in Maryland long ago. *Id.* at 34-35.

9. Miranda impressed procedural safeguards on the traditional test of voluntariness by way of warnings to be given. "These warnings are not in themselves rights protected by the Constitution but are instead measures to insure that the privilege against compulsory self-incrimination is protected. Michigan v. Tucker, 417 U. S. 433, 444, 94 S. Ct. 2357 (1974). Thus, they have no constitutional basis, but are prophylactic rules created by judicial decision to safeguard that constitutional privilege. *Id.* at 445-446." Kidd, 281 Md. at 36-37. Davis v. North Carolina, 384 U. S. 737, 86 S. Ct. 1761 (1966) and Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772 (1966), which held that *Miranda* was to be applied prospectively, did not limit in any manner the review of voluntariness in cases in which the trial was held prior to the Supreme Court's decisions in Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758 (1964) and in *Miranda. Davis* at 740.

The breadth of the exception for volunteered statements is not made entirely clear in *Miranda,* and commentators have read the opinion differently in this respect. *See, for example,* 1 C. Wright, Federal Practice and Procedure (Criminal) § 76 at 112-113 (1969); Kamisar, 67 Geo.L.J. at 14-15, n. 85.

> anxiety. It augmented or intensified the tolerable level of stress, confusion, and anxiety inherent in every arrest and detention to the impermissible level of "compulsion". The resulting statement was clearly not "volunteered" or the product of "the unfettered exercise of [Vines'] own will." (Footnotes and citations omitted).

He notes that "[t]here was no legitimate reason for showing [him] the narcotics that had been seized during the raid on his home." He observes: "If this was standard police procedure, it is all the more offensive."

The Supreme Court has recognized that the modern practice of in-custody interrogation is psychologically rather than physically oriented. *Miranda* at 448. But our independent review of the entire record convinces us, as it did the Court of Special Appeals, that the conduct of the police in the circumstances here did not amount to psychological coercion. We follow the reasoning of the intermediate appellate court:

> It is not disputed that shortly before making the inculpatory disclosure, [Vines] had been fully apprised of his right to remain silent and that anything he said might be used against him in a court of law. It is also undisputed that he understood those rights. Merely because the police entertained the hope (not expressed to [Vines]) that the display of narcotics would produce an incriminating statement does not mean that in allowing [Vines] to view the display they were improperly compelling, coercing, or inducing [Vines] to speak. We agree with the trial judge who, in denying the motion to suppress, said: "The defendant I don't think was compelled under the atmosphere to say anything, and he wasn't asked any questions as far as I am concerned in the roll call room". Ironically, according to [Vines'] version of the events in the roll call room, the police never informed him that the drugs displayed were seized in the raid on his house, but rather in the area of a nearby bar — thus rendering

the notion of "psychological coercion" even more remote. *Vines,* 40 Md. App. at 661.[10]

We hold that the statements were voluntary in the traditional sense.

Since the *Miranda* strictures offered no impediment to the admission of the statements, and since they were voluntary in the traditional sense, it follows that the trial court did not err in denying the motion to suppress them. Therefore, the Court of Special Appeals was correct in affirming the judgment of the trial court.

### III

Moylan, J., in his concurring opinion in *Vines,* expressed the strong conviction that under decisions of the Supreme Court as presently construed, *"Miranda* is now sapped of all vitality except in those cases squarely covered by it." 40 Md. App. at 667. He would give *Miranda* "a tightly restrictive reading" because he believes that it is "in distinct disfavor and that it will not be extended by the Supreme Court by so much as a millimeter." *Id.* at 666. He recognizes that the Supreme Court has not "frankly and candidly" overruled *Miranda,* but, he suggests, this would be a cleaner method of accomplishing the constitutional purpose he sees in opinions of the Court during the last decade to retreat from what he characterizes as the liberality of the Warren Court's revolution of the constitutional-criminal process. *Id.* 665-666.

As Judge Moylan points out: "Not since 1968 has the Supreme Court reversed a conviction on the basis of *Miranda* nor even held *Miranda* to apply." *Id.* at 665. This may well be, however, because the authorities have largely accepted *Miranda,* ordinarily complying with its dictates and generally conforming their procedures to its requirements. It is correct

---

10. We point out that no deceit or subterfuge was employed by the police; the evidence displayed and listed on the inventory was that actually seized in the raid. In any event, deceit or subterfuge on the part of the police does not necessarily make a statement involuntary. *See* Frazier v. Cupp, 394 U. S. 731, 89 S. Ct. 1420 (1969); Humphrey v. State, 39 Md. App. 484, 386 A. 2d 1238, *cert. denied,* 283 Md. 733 (1978); Hopkins v. State, 19 Md. App. 414, 311 A. 2d 483 (1973), *cert. denied,* 271 Md. 738 (1974).

that the Court in explicating *Miranda* in light of various circumstances has not expanded it, as is evidenced by cases cited by Judge Moylan at 665. But we do not think that a tightly restricted reading of *Miranda* is necessary to lead to the result we have here reached. It is simply, as we have indicated, that in the circumstances of this case, there was no "interrogation" within the meaning of *Miranda* to invoke its application.

In any event, we do not share the view that *Miranda* "is now sapped of all vitality except in those cases squarely covered by it." We quote with approval what the Court of Special Appeals observed in *Gaudio and Bucci v. State,* 1 Md. App. 455, 230 A. 2d 700 (1967):

> We recognize the rationale of *Miranda* and share the concern for justice — the constant and perpetual disposition to render every man, whether innocent or guilty, what is his due. But a balance must be maintained which does justice not only to the accused but also to society. When weighted too much on either side, imbalance occurs and justice is not served. [*Id.* at 469.]

*Judgment affirmed; costs to be paid by appellant.*