481 A.2d 241

**James Conrad SCHMIDT**

v.

**STATE of Maryland.**

**No. 1035, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Sept. 10, 1984.

Certiorari Denied Jan. 8, 1985.

88

David E. Pierson, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender of Md., on the brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen. of Md., and Lawrence A. Dorsey, Jr., State's Atty. for Frederick County on the brief, for appellee.

Argued before BISHOP, GARRITY and BLOOM, JJ.

BLOOM, Judge.

James Conrad Schmidt, appellant, was convicted by a jury in the Circuit Court for Frederick County of second degree rape, second degree sexual offense and burglary. He received concurrent sentences of twenty years imprisonment for each offense. He now contends that

1) the erroneous admission of a statement he made at a bond hearing requires reversal,

2) the trial court erred in refusing to suppress statements obtained from him in violation of his Miranda rights,

3) the trial court's failure to instruct the jury on the standard for consideration of his statements constituted plain error, and

4) the trial court should have declared a mistrial and reselected the jury.

We disagree with all of appellant's contentions and, therefore, we will affirm the convictions and sentences.

### Facts

On December 22, 1981, Victoria Thompson was staying in the apartment of her friend Virginia Sulcer. At about 1:00 a.m., Ms. Thompson and another friend, Janice Onderdonk, left the apartment and went to a bar called McGurk's, where each had one drink. Seated about twenty feet away

from them at the bar was the appellant. Ms. Onderdonk did not know Schmidt; Ms. Thompson recognized Schmidt's face but did not remember his name. As the two ladies left the bar, Schmidt held the door open for them and he and Ms. Thompson exchanged a few words. There had been no communication between Schmidt and either of the two women prior to then.

As the two ladies left McGurk's, Ms. Onderdonk observed a blue Chrysler or Plymouth automobile in the parking lot. (At trial she referred to it as appellant's car but did not state how she knew this.) She did not see but assumed that appellant got into his car as the women got into their automobile.

Ms. Onderdonk drove Ms. Thompson back to Ms. Sulcer's apartment, entered and remained for a few minutes and then left. She was sure the door was locked behind her as she left. Aside from Ms. Sulcer, who was not home at the time, only Ms. Onderdonk and Ms. Thompson had keys to the apartment. As Ms. Onderdonk returned to her car, she observed an automobile very similar to the Plymouth or Chrysler she had seen on McGurk's parking lot earlier that night.

After Ms. Onderdonk left the apartment, Ms. Thompson locked the door, prepared for bed and removed her contact lenses, without which her vision is 20–200. After she had been in bed for about twenty minutes, she heard a banging noise at the door. She then heard someone enter her room and, thinking it was Ms. Sulcer, turned to greet her when a man put his hand over her mouth, told her to be quiet and then put a pillow over her eyes. She was afraid she would be suffocated, but the man loosened the pillow and told her he would not hurt her if she cooperated. He forced her to commit fellatio, performed cunnilingus on her and then raped her. During the entire time, he kept either the pillow or bedclothes over her face. Thus, Ms. Thompson did not see her assailant except in silhouette as he first entered the room.

Ms. Thompson heard the man leave the apartment and run down the steps. Then she heard the squeal of automobile wheels. She got up, armed herself with a knife, and telephoned her mother and her neighbors. After her neighbors arrived, she found some keys on the floor, which she turned over to the police. She also gave the police a description of her assailant as a tall man with a beard, mustache and light hair. She did not recognize her assailant by his appearance or his voice. She did, however, tell the police that she had met James Schmidt at McGurk's earlier that night. At first she did not recognize him but later remembered him as someone she had known in high school and had not seen for several years.

On the afternoon of December 24, Lieutenant James R. Fraley and Officer Thomas H. Woodward of the Frederick City Police Department went to appellant's residence to interview him in connection with the rape of Ms. Thompson. Schmidt did not want to discuss the case in front of his family, so he went outside to talk to the police. Because it was cold and damp, Lt. Fraley suggested that the interview be conducted in his unmarked police car, to which Schmidt agreed. Schmidt was under no restraint. He had not been arrested and, according to the police, was not then under suspicion.

The police informed Schmidt they were investigating the sexual assault on Ms. Thompson and that she remembered seeing him in the bar that night. Schmidt denied noticing Ms. Thompson and insisted that he had driven directly home from McGurk's. He said he knew Ms. Thompson only slightly but was acquainted with her sister. The officers advised Schmidt that Ms. Thompson's assailant had dropped his keys and they showed him the key ring that the victim had turned over to them. Schmidt denied any knowledge of the key ring. There were three Chrysler Motor Company keys on this key ring and the officers asked Schmidt's permission to try those keys on the two Chrysler-Plymouth automobiles (one yellow, one blue) in the driveway. Schmidt gave his permission but as the officer started to

get out of the police car, Schmidt told him, "Never mind, they fit." When asked if he wanted to talk, Schmidt said he did, but he wanted to go elsewhere to do so. He agreed to go to police headquarters where, after being advised of his constitutional rights, he made an inculpatory statement that was reduced to writing. Schmidt signed the statement, after which he was arrested.

Four days later, Schmidt appeared, without counsel, at a bail hearing in the District Court. The judge asked him if he knew the alleged victim and Schmidt replied, "At the time, no sir, I didn't. I was drunk. I didn't know who it was."

## Motion to Suppress

Pursuant to then Md.Rule 736 a, [new Rule 4–252(a)] Schmidt filed a pre-trial motion to suppress "any and all oral and written statements alleged by the State of Maryland to have been made by him...." At the hearing on that motion, the State presented evidence as to the statements made in the police car outside Schmidt's home and at police headquarters, the circumstances under which those statements were made and the manner in which the one at headquarters was recorded, transcribed, and signed. The witnesses for the State testified that the written statement was accurate and that Schmidt read it before he signed it. The police insisted that Schmidt was not under arrest, was not restrained in any way and was free to leave at any time until he was arrested. Schmidt testified that once he told the police that the keys in their possession would fit the cars in his driveway he felt he was under some restraint despite the fact that he had not been arrested. He claimed that the written statement was inaccurately recorded and transcribed and denied that he read it before he signed it. He said that at first he didn't recognize Ms. Thompson but then remembered who she was and followed her home. He admitted that he had engaged in sexual relations with Ms. Thompson but claimed it was with her consent and without

any force or threats on his part. The court denied the suppression motion.

### Trial

At the trial, the State produced evidence as to the events of December 22 through testimony of Ms. Sulcer, Ms. Onderdonk and Ms. Thompson, as well as from a neighbor who responded to the victim's telephone call and the victim's mother and stepfather. A police chemist and the police officers who investigated the crime and interrogated the appellant also testified. Appellant's written statement was introduced into evidence. The State then called, as the last witness during its case in chief, an investigator in the State's Attorney's office who was permitted to testify, over objection, as to Schmidt's response to the District Court judge's question during the bail hearing.

Appellant presented testimony from his parents and girlfriend to the effect that at the time of the offense appellant had financial difficulties and other problems. Appellant testified that he had been working several jobs and was drinking heavily on December 22. He was at McGurk's bar and, after a drink, left at the same time as Ms. Thompson. He recognized her but did not remember her name until he was in his car. He followed her home because he and Ms. Thompson's sister had been close friends and he wanted to have someone relay a message to his girlfriend, with whom he had quarrelled. He reached Ms. Thompson's apartment some minutes after she did and remained in his car for another few minutes looking for his cigarettes. He went through the front door and walked upstairs. According to him, the door to Ms. Thompson's apartment was not completely closed and it fell open when he knocked on it. He testified that he heard Ms. Thompson say, "Is that you, Jim?" He answered, "Yes," and walked into the bedroom. Conversation led to kissing and then sexual intercourse. Ms. Thompson suddenly started to cry and pushed him away. He tried to comfort her, but she asked him to leave. As he was leaving, he tripped over the telephone cord,

accidentally pulling it out of the wall. Appellant repeated his testimony from the suppression hearing about inaccuracies in the written statement.

I. *The Statement Made at the Bail Hearing*

█ Appellant contends that inculpatory statements made by an accused at a bail hearing should be excluded under any circumstances. Referring to the importance of bail in the American legal system and the "right" to be released on reasonable bail as the general rule, he argues that the admissibility at trial of a statement made at a bail hearing would force an accused to choose between a meaningful determination of his eligibility for bail and the preservation of his right against self-incrimination. *See State v. Williams*, 115 N.H. 437, 343 A.2d 29 (1975). Courts in Minnesota and Florida, however, have upheld the admission of statements made by accuseds at bail hearings upon findings that the statements were made with the full advice of counsel. *State v. Van Wert*, 294 Minn. 464, 199 N.W.2d 514 (1972); *Raffield v. State*, 333 So.2d 534 (Fla.App.1976), *modified*, 351 So.2d 945 (Fla.1977). We see no need for the *per se* exclusionary rule urged by appellant. If an accused who is represented by counsel and who is made aware of his fifth amendment right volunteers a statement deemed helpful to his position at a bail hearing, there is no logical reason why that statement could not be used against him at trial.

█ Appellant next contends that even in the absence of a *per se* exclusionary rule, *his* statement at *his* bail hearing was inadmissible because it was a response to an interrogation made in a custodial setting without *Miranda* [1] warnings.

The State argues that because appellant did not file a pretrial motion to suppress the bail hearing statement the issue was not preserved for appellate review. Former

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Md.Rule 736 a 4 [see new Rule 4–252(a)(4) ]; *Kohr v. State,* 40 Md.App. 92, 388 A.2d 1242 (1978). The State is wrong. Appellant's motion to suppress included *all* oral and written statements. The failure of the State to mention the bail hearing statement at the suppression hearing, coupled with its failure to furnish appellant with automatic discovery as required by former Md.Rule 741 a 2 (b) [see new Rule 4–263 (a)(2)(B) ], effectively concealed from him the existence of this statement as potential evidence.

Since appellant could not have known of the State's proposed use of his bail hearing statement until it offered the statement into evidence, his objection to its admission was sufficient to raise the issue. And since he did not volunteer and was not asked to state the ground of his objection, *all* grounds were preserved for review. Former Md.Rules 761, 522 d [see new Rule 4–322 (a) ]; *von Lusch v. State,* 279 Md. 255, 368 A.2d 468 (1977).

It is necessary, therefore, to address appellant's *Miranda* argument.

■ The *Miranda* litany of warnings to a suspect of his right to remain silent and to have counsel present during interrogation are by now too familiar to require repetition here. We need only note that there is a basic rule that in a criminal case a statement (confession or admission [2]) stemming from a custodial interrogation of the defendant may be received into evidence against him over a proper objection only if the State has shown by a preponderance of the evidence that the statement was voluntary in the traditional sense and that there had been a compliance with the *Miranda* safeguards. *State v. Kidd,* 281 Md. 32, 375 A.2d 1105 (1977).

---

**2.** For the distinction between a confession and an admission, *see Stewart v. State,* 232 Md. 318, 323, 193 A.2d 40 (1963). The test for receipt into evidence against an accused is the same for an admission and a confession. *Id.* at 323–324, 193 A.2d 40.

■ Although the *Miranda* decision stemmed from a concern that the "compulsion inherent in custodial surroundings" may endanger an individual's fifth amendment right to be free from compelled self-incrimination, 384 U.S. at 457–458, 86 S.Ct. at 1618–1619, we must remember that the warnings designed to overcome that danger are merely "prophylactic rules" rather than constitutional dictates. *Michigan v. Tucker*, 417 U.S. 433, 439, 94 S.Ct. 2357, 2361, 41 L.Ed.2d 182 (1974). We must also bear in mind that statements obtained from a defendant who had not been given the *Miranda* warnings need only be excluded from evidence if they resulted from a "custodial interrogation" within the meaning of *Miranda*. *Vines v. State*, 285 Md. 369, 374, 402 A.2d 900 (1979). "Custodial interrogation" was defined in *Miranda v. Arizona, supra*, as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted).

As Judge Orth wrote for the Court of Appeals in *Vines*, 285 Md. at 375, 402 A.2d 900, quoting Kamisar, *Brewer v. Williams, Massiah, and Miranda: What Is "Interrogation"? When Does It Matter?*, 67 Geo.L.J. 1, 14 n. 85 (1978):

"Because the custody issue has arisen more frequently and has generally been regarded as a more difficult one, a good deal more attention has been paid to what constitutes *custodial* interrogation than what constitutes custodial *interrogation*."

■ In this case, as in *Vines*, the *custodial* aspect of "custodial interrogation" presents no problem. Schmidt was unquestionably in custody when he appeared before the District Court judge for a bail hearing. He had been arrested and charged; the very purpose of the hearing was to determine whether or under what circumstances he might be released from custody. With respect to the custody aspect, the fact that Schmidt was in a courtroom rather than the stationhouse is of no significance. Custodial ques-

tioning can occur in settings other than the police station, even in the defendant's own home if he has been arrested and is no longer free to go where he pleases. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Nor is it significant, with respect to the *custodial* aspect of "custodial interrogation," that the question was asked by a judge rather than a policeman. As Judge Morton noted for this court in *Marrs v. State,* 53 Md.App. 230, 233, 452 A.2d 992 (1982):

> Just as custodial interrogation is not limited to police station-house interrogation, *see Mathis v. United States,* 391 U.S. 1 [88 S.Ct. 1503, 20 L.Ed.2d 381] (1968), *Orozco v. Texas,* 394 U.S. 324 [89 S.Ct. 1095, 22 L.Ed.2d 311] (1969), neither is the protection of the fifth amendment limited to any single source of official interrogation. Where a defendant is subject to the inherently compelling pressures of a custodial situation, in order to intelligently exercise his fifth amendment rights, he "must receive certain warnings before *any official interrogation*" (emphasis supplied), *Estelle v. Smith,* 451 U.S. 454, 467 [101 S.Ct. 1866, 1875, 68 L.Ed.2d 359] (1981), whether the official interrogator be a prison guard, *Whitfield v. State,* 287 Md. 124 [411 A.2d 415] (1980), *cert. dismissed,* 446 U.S. 993 [100 S.Ct. 2980, 64 L.Ed.2d 850] (1980), an agent of the Internal Revenue Service, *Mathis v. United States, supra,* a court designated psychiatrist, *Estelle v. Smith, supra,* or a prosecuting attorney, *People v. Arnold* [66 Cal.2d 438, 58 Cal.Rptr. 115], 426 P.2d 515 (Cal.1967).[3]

---

**3.** Marrs had been arrested for trespass. In the police car on the way to the police station and at the stationhouse his probation officer questioned him about an arson that had occurred a year earlier. The probation officer wanted to be able to make a recommendation as to whether Marrs's bail and probation should be revoked. Marrs refused to talk in front of the police officers, but when they left the room he answered the questions of the probation agent, admitting that he had set the earlier fires. We held that the failure to give Marrs the *Miranda* warnings required exclusion of his admission. *Compare,* however, *Minnesota v. Murphy,* —— U.S. ——, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), in which *Miranda* was held not to apply to questioning by the defendant's probation agent. The defendant was

Nevertheless, although Schmidt was in custody, the question put to him by the District Court judge was not an *interrogation* within the meaning of the *Miranda* rule. Not all questions asked of a prisoner or suspect while he is in custody constitute a "custodial interrogation" for purposes of requiring *Miranda* warnings. As Judge Orth noted for the Court in *Vines*, 285 Md. at 376, 402 A.2d 900, it is generally agreed that *Miranda* does not apply to "administrative questioning," the routine questions asked of all arrestees while being processed or "booked." Such routine questioning is conducted for purposes unrelated to evidence gathering and prosecution, so the questions are general in nature rather than specifically directed to any criminal offense. Similarly, any questions asked of an arrestee at a bail hearing should normally be general and unrelated to evidence gathering or prosecution. In this case, when the District Court judge asked Schmidt if he knew the alleged victim, the purpose of that question was to enable the judge to set an appropriate amount of bail, not to secure information for the prosecution. Whether the victim and the accused were acquaintances or total strangers may affect the nature and strength of the evidence against the accused. Accused of a serious crime and facing a potentially severe sentence if convicted, a defendant who can be identified with certainty by the alleged victim may represent a potential danger to the prosecuting witness or a substantial risk of nonappearance. These factors are clearly relevant to pretrial release. *See* Md.Rule 4–216 (f) (formerly MDR 721 e).

It is, of course, possible that in a given case an arrestee may give what eventually turns out to be an incriminating response to a routine "booking" question, just as Schmidt gave what turned out to be an incriminating

---

not in custody at the time, and his obligation to appear at the probation agent's office and answer questions truthfully did not convert his voluntary statements to compelled ones within the meaning of the Fifth Amendment.

response [4] to a reasonably routine question at his bail hearing. Since Schmidt was not in the inherently compulsive atmosphere of custodial interrogation, the incriminatory nature of his response does not mean that it must be excluded merely because it was not preceded by *Miranda* warnings. Those warnings were designed to guard against compelled, not voluntary self-incrimination. "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977).

Schmidt's anxiety to be released on bail does not amount to a coercion to incriminate himself. Indeed, he was clearly acting under far less compulsion than if he had been subpoenaed to testify before a grand jury, a situation which does not require *Miranda* warnings. *See United States v. Mandujano,* 425 U.S. 564, 579–580, 96 S.Ct. 1768, 1777–1778, 48 L.Ed.2d 212 (1976). In that case, Chief Justice Burger, speaking for the Court, observed:

> Those [*Miranda* ] warnings were aimed at the evils seen by the Court as endemic to police interrogation of a person in custody. *Miranda* addressed extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. The decision expressly rested on the privilege against compulsory self-incrimination; the prescribed warnings sought to negate the "compulsion" thought to be inherent in police station interrogation. But the *Miranda* Court simply did not perceive judicial inquiries and custodial interrogation as equivalents. "[T]he compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U.S. at 461 [86 S.Ct. at 1621].

---

**4.** Incriminating only because it was inconsistent with the "consent" defense.

The Court thus recognized that many official investigations, such as grand jury questioning, take place in a setting wholly different from custodial police interrogation. Indeed, the Court's opinion in *Miranda* reveals a focus on what was seen by the Court as police "coercion" derived from "factual studies [relating to] police violence and the 'third degree' ... physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions...." *Id.*, at 445–446 [86 S.Ct. at 1612–1613]. To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda;* the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by the Court.

(footnote omitted).

▬▬ Considering the fact that the *Miranda* warnings are not constitutional dictates but merely prophylactic rules designed to protect an accused from self-accusation coerced by police conduct outside of judicial scrutiny, we hold that questions about matters relevant to bail, asked of an accused by a judge, in a courtroom, do not constitute a "custodial interrogation" [5] requiring that the accused be warned or advised of his *Miranda* rights in order that his responses may be admitted into evidence over his objection. Indeed, the *Miranda* warnings, particularly the advice that the accused is entitled to have counsel appointed for him before questioning, would be entirely inaccurate and inappropriate. A bail hearing is not such a proceeding as would constitutionally entitle the accused to the assistance of counsel. *Hebron v. State,* 13 Md.App. 134, 281 A.2d 547 (1971). *Compare United States v. Mandujano,* 425 U.S. at 580–581, 96 S.Ct. at 1778, pointing out that a witness before

---

**5.** We need not and do not decide whether questions unrelated to bail consideration or questions designed to elicit incriminating admissions would constitute "custodial interrogation."

a grand jury does not have a right to have counsel present during questioning.

## II.  *The Statements to the Police*

■ Appellant contends that the statement he made to the police officers in their car, admitting that the keys they showed him would fit the cars in his driveway, was elicited by the officers in violation of the strictures of *Miranda v. Arizona, supra,* and should have been suppressed. That contention leads to the assertion that the statement made at police headquarters, being a product of and tainted by the earlier one, also should have been suppressed.

Appellant's argument, that the police officers did not give him proper warnings of his rights "despite the custodial nature of the interrogation," fails because the motion hearing judge properly found, on adequate evidence, that the interview in the police car was not a custodial interrogation.

The interview occurred in the afternoon at Schmidt's place of residence.  He wanted to go outside so his family would not be involved.  The discussion took place in the police cruiser because it was a cold, damp day.  According to the police, suspicion had not focused on Schmidt.  As they told him, they were conducting an investigation and hoped that he may have observed someone or something at McGurk's that could be of assistance to them.  There were no indicia of arrest, and the interview was conducted in a casual manner.  Schmidt was not even arrested after he made the admission about his keys;  the interview was merely continued at police headquarters where Schmidt was informed of his *Miranda* rights.  The factual determination that the interview in the police cruiser was not a custodial interrogation was not clearly erroneous.  Md.Rule 1086.

■ Since the initial interview was not "tainted," there was no basis for suppressing the subsequent statement, made after appellant was advised of his rights, as the "fruit of the poisoned tree."  There was no poisoned tree.

### III. *The Instructions to the Jury*

When we see in an appellant's brief the phrase "plain error" in relation to jury instructions, we are immediately put on notice that appellant failed to preserve an issue for appellate review.

Former Rules 757 f and h [see new Rule 4–325 (e)] provided that an objection to the court's instructions was not reviewable as of right unless it was made on the record before the jury retired and distinctly stated the matter or omission complained of and the grounds for the objection. Having failed to object to the instructions as required by that rule, appellant now asks us to invoke a provision in former Rule 757 h [new Rule 4–325 (e)] authorizing us to "take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to" as provided in the rule.

The court instructed the jury that it must disregard Schmidt's "confession" unless it was satisfied beyond a reasonable doubt and to a moral certainty that the confession was made freely and voluntarily and was accurately recorded by the police. Appellant complains that the court did not further instruct the jury that it would have to find beyond a reasonable doubt that he had received his *Miranda* warnings. In view of the fact that Schmidt admittedly received *Miranda* warnings prior to the only custodial interrogation he underwent, we see no prejudicial error at all, much less "plain error material to the rights of the defendant."

### IV. *The Failure to Declare a Mistrial*

After a jury had been selected, one of the jurors said she could not be impartial after she heard that the case involved an assailant breaking into a victim's apartment, beating and raping her. That juror was then excused for cause. Appellant's trial counsel specifically stated that he did not want a mistrial. At defense counsel's request, a curative instruction was given. Another juror admitted

that his brother was a Frederick City police officer but stated that such relationship would not affect his ability to be impartial in judgment. The court refused to strike that juror for cause. Thereafter, appellant and his attorney stated they had no objection to the juror remaining.

Appellant now complains that the court should have declared a mistrial *sua sponte.* Nonsense! It would have been grossly wrong for the court to have declared a mistrial when appellant not only had not requested one but had stated he did not want one. Appellant was granted all the protections he asked for; his failure to ask for more constituted a waiver of his right to complain on appeal. Md.Rule 1085. *See Jackson v. State,* 288 Md. 191, 197, 416 A.2d 278 (1980).

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.